## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ARCHITECTURAL BUSSTRUT )
CORPORATION d/b/a busSTRUT, )       Civil Action No. ___2:18-cv-1181___
                         )
        Plaintiff, )
                         )
v.                       )
                         )
UNIVERSAL ELECTRIC       )
CORPORATION,             )
                         )
        Defendant. )

## COMPLAINT

Plaintiff Architectural busSTRUT Corporation ("Plaintiff" or "busSTRUT"), by and through its undersigned counsel, files the following Complaint against Defendant Universal Electric Corporation ("Defendant" or "UEC") and hereby alleges as follows:

## INTRODUCTION

1.      While proper competition is permissible, unfair and tortious competition is not. This case is about unfair competition and big business taking advantage of and betraying a small, family-owned business.

2.      BusSTRUT is a lighting business that supplies a proprietary, superior, and environmentally conscious lighting system to national retailers which includes as a part and component the ability to "drop power" (i.e., power things like refrigeration and display cases from the lighting system through power cords).

3.      Dating back to 2004, busSTRUT used UEC as its exclusive supplier and partner for manufacturing busSTRUT's lighting system.

4.      This longstanding relationship and partnership—approximately 14 years—has been incredibly lucrative to UEC; resulting in over $27 million in revenue with almost $10 million occurring in 2017 alone.

5.      During the Parties' longstanding business relationship and partnership, they entered into various non-competition and confidentiality agreements.

6.      As to the former, the Parties agreed not to compete with one another with respect to their customers (including indirectly by quoting others for that business) and that UEC would not manufacture, have manufactured, purchase, and/or sell a substantially similar product.

7.      As to the latter, the Parties agreed to keep information exchanged confidential and to refrain from using the same except as necessary to assist in performing under the Parties' various agreements.

8.      BusSTRUT invests substantial resources and often engages in an arduous and expensive courting process to obtain national retailer clients because they are lucrative and provide a steady pipeline of repeat business through new stores and remodels.

9.      After an arduous and expensive courting process that UEC was apprised of, busSTRUT secured a three-year agreement with Target Corporation ("Target") to fulfill its structural track/busway/power distribution system needs for new stores and remodels.

10.     A key part in securing at least the "Super Target" portion of the Target business was busSTRUT's ability to "drop power" because, among other reasons, Super Target stores require power drops to refrigeration cases.

11.     Given Target's large, national presence and substantial expansion and remodeling efforts—particularly in the latter half of 2018 and 2019—busSTRUT's future was bright and it appeared to be destined for immense success.

12.     Accordingly, busSTRUT invested millions of dollars in hiring employees and securing necessary material to fulfill Target's needs.

13.     For over a year, busSTRUT supplied Target with its needs for hundreds of new stores and remodels.

14.     During this period, busSTRUT's sales to Target exceeded fourteen million dollars and busSTRUT made purchases nearing twelve million from UEC.

15.     Recently, however, Target indicated that busSTRUT would be "substituted" for the vast majority of its forthcoming stores and remodels including Super Targets stores.

16.     Shockingly, busSTRUT later discovered that Target was receiving its power drops—the same part and component that was integral to receiving the "Super Target" business— from its ***longtime partner UEC*** who supplied power drops to busSTRUT.

17.     UEC's betrayal and improper acquisition of the Target business is a classic example of tortious interference and unfair competition, and constitutes a blatant breach of the Parties' agreements.

18.     UEC was indisputably aware of busSTRUT's contract and relationship with Target and agreed to refrain from competing with the same.

19.     UEC also had access to highly confidential information as a result of their longstanding relationship with busSTRUT and agreed to keep such information confidential and only use it as necessary to perform under the Parties' agreements.

20.     Moreover, as later discovered by busSTRUT, and in violation of its agreements with busSTRUT and applicable laws, UEC is falsely advertising and misrepresenting a competing product, Starline.  These false advertisements and misrepresentations give rise to separate and independent liability under the Lanham Act and other laws.

21.     When busSTRUT confronted the UEC regarding their interference and breaches, UEC repeatedly admitted that they were well aware of busSTRUT's multi-year contract with Target and that UEC was supplying Target with "power drops".

22.     Notably, however, UEC otherwise refused to further discuss the circumstances surrounding their theft of the Target business.

23.     BusSTRUT respectfully brings this action against UEC—their longtime partner whom over fourteen years they placed substantial trust in and paid over twenty-seven million dollars—to correct an injustice and punish UEC for their unlawful conduct, breaches of the Parties' agreements, and tortious interference.

24.     BusSTRUT seeks not only damages from UEC's wrongful conduct, but also UEC's sales from the Starline product to all customers and busSTRUT's costs and attorneys' fees for having to bring this action.

## PARTIES

25.     Plaintiff busSTRUT is a corporation organized and existing under the laws of the State of Delaware.  Its principal place of business is in Worthington, Ohio.

26.     Defendant UEC is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business in the Commonwealth of Pennsylvania at 168 Georgetown Road, Canonsburg, Pennsylvania 15317.

## JURISDICTION & VENUE

27.     This Court has subject-matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

28.     Venue is proper in the Western District of Pennsylvania and this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Western District of Pennsylvania.

29.     This Court has personal jurisdiction over UEC pursuant to 42 Pa. C.S. § 5322 because UEC has, individually and/or in concert with others, (a) transacted business in the Commonwealth of Pennsylvania, (b) offered to and contracted to supply goods or services in Pennsylvania; and/or (c) caused harm or tortious injury in Pennsylvania by an act or omission outside of Pennsylvania.

30.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that a substantial part of the events and omissions giving rise to busSTRUT's claims occurred and/or continue to occur in this District.

31.     Some of busSTRUT's claims in this Complaint arise from an Exclusive Manufacturing and Distribution Agreement between busSTRUT and UEC.  That Agreement provides that the Parties agree to submit to Pennsylvania jurisdiction and venue in the United States District Court for the Western District of Pennsylvania, Pittsburgh division for purposes of Section 8 and Section 11 of that Agreement.  The claims asserted in this Complaint arising from that Agreement all fall under Section 8 and Section 11.

## FACTUAL BACKGROUND

**A.**     **UEC is a Large Manufacturer of Electrical and Lighting Products**

32.     UEC is a large manufacturer of electrical products based in Pennsylvania.

33.     UEC also sells electrical products direct to customers.

**B.**     **BusSTRUT is a Family-Owned Lighting Business in the Lighting Industry**

34.     BusSTRUT is a family-owned lighting business founded in 2004.

35.     BusSTRUT has numerous national account customers, some of which it has served for longer than a decade.

36.     BusSTRUT sells a proprietary lighting system capable of dropping power to the floor through the use of power drops and suspending from the ceiling décor items, such as decorative boards.

37.     This proprietary lighting system is referred to as Heavy-Duty/Structural track, "Busway", and/or a Power Distribution System (hereinafter "Power Distribution System" or the "System").

38.     A core and integral part and component of busSTRUT's System is its ability to "drop power" through power drops.

39.     This part and component enables retailers to power things like displays and refrigeration from their lighting system.

40.     BusSTRUT not only sells the merits of the System, but provides customized shop drawings for each project, and offers construction bid management services.

41.     BusSTRUT takes particular pride in teaching prospective customers creative uses of the System.

42.     BusSTRUT's System is designed to maximize flexibility for retailers/customers whom remodel and thus relocate where they need power and lighting.

43.     Rather than implementing inflexible, conventional lighting and power systems, a retail space with busSTRUT can be reconfigured, as the busSTRUT material can be reused.

44.     This not only saves on construction costs, but is environmentally conscious.

45.     For many retailers, including Target Corporation, a key feature of busSTRUT's System is its ability to drop power.

46. BusSTRUT's System is designed so that retailers/customers will have substantial labor savings—i.e., it is significantly easier (and less costly) to assemble than typical structural track lighting systems.

47. BusSTRUT's System is particularly valuable and attractive to retailers/customers that wish to arrange track lighting in a "grid" configuration. A common problem in constructing such grid configurations is that it necessitate three types of complicated electrical intersections.

48. First, an "L" electrical intersection is required at the corner of electrical grids. Second, a "T" electrical intersection is required where the perimeter of the grid is connected to intersecting lengths of the grid. Third, an "X" electrical intersection is required at the center of the grids (where four electrified lengths meet at the center, in a spoke configuration).

49. Because all three types of intersections (L, T, and X) require different directions for the electricity to travel, each requires a different electrical configuration. One method for accommodating these three different types of electrical configurations is to manufacture and stock three distinct types of pre-wired electrical connectors. Such pre-wired connectors require a great deal of engineering and tooling expense. Another method is to leave the problem to the electrical contractor installing such grids to custom wire each connector at the job-site. However, this option also has its own downsides, such as strict electrical safety rules required for making such complicated electrical connections at individual job sites, as opposed to a more controlled factory environment. In addition, there are high installation costs (oftentimes more than $100 per hour) for electrical contractors to custom wire these complicated connectors.

50. BusSTRUT solves the above tradeoff and downsides by using a highly engineered electrical connector (busSTRUT Jumper) that can be configured to safely make "L," "T," and "X" electrical connections—all from the same connector. In other words, unlike more common Power

Distribution Systems, busSTRUT can make all connection types with the same connector without resort to different pre-wired electrical connectors or having electrical connections custom wired at individual job sites.   The greatest electrical systems use the fewest parts, so this common connection is an impressive innovation enabling seamless construction of complicated electrical grids.

51.     As is the case generally with Power Distribution Systems, busSTRUT's System is also particularly valuable and attractive to retailers/customers that wish to hold up items and/or décor without secondary support; such as decorative wood décor.   Unlike your typical light duty track—which is distinct from Power Distribution Systems—busSTRUT's System is capable of holding substantial weight without secondary support.

52.     Notably, busSTRUT's System is capable of holding substantial weight while supported at intervals of up to 10 feet (i.e., without secondary support).   This has noticeable architectural benefits.

53.     BusSTRUT's ability to hold up substantial weight is due in large part to its use of steel to support such weight.

54.     Additionally, prospective customers associate steel—as opposed to aluminum or other materials—with durability and quality.

55.     As explained below, UEC inappropriately takes advantage of such an association.

56.     BusSTRUT is one of the very few companies that focuses on marketing the integration of light fixtures with busway power distribution.

57.     While many busway systems have busway "fittings" listed as devices, such "fittings" need to be modified for mating with many types of light fixtures (mostly accent lights,

which require wire leads be smaller than is typical for such fittings, in order to fit inside compact accent light housings).

58.     Furthermore, even if the fitting itself doesn't need to be modified, accent light fixtures are typically only listed by their manufacturer's available track (*e.g.*, Juno, Halo, Lightolier, Global) fittings.  In other words, once accent light fixtures are modified by the removal of the aforementioned track fitting and replaced with a busway fitting, such are no longer UL listed.

59.     Consequently, busSTRUT warns customers that some types of light fixtures need to be purchased from busSTRUT, as such fixtures combined with new busway fittings need to be UL listed as a new type of assembly.  Such UL listings are extremely expensive, time consuming, and depend on the cooperation of the light fixture manufacturer; making it impracticable to UL list the preferred light fixtures of every customer.

60.     This necessary safety measure hurts busSTRUT's business interests—as customers would prefer to be able to mate the busway fitting with any light fixture of their choosing.

61.     BusSTRUT's commitment to following UL standards is thus a weight on its business operation, but a necessary one for both legal and ethical reasons.

62.     As explained below, UEC does not make the same commitment.

63.     BusSTRUT's System has been utilized across the country by many national clients including, but not limited to, iconic names/brands like American Eagle, Victoria's Secret, Yale University, Staples, and L.L. Bean.

64.     An example of busSTRUT's System and some of its capabilities, such as its ability to drop power, create electrical grids (i.e. X electrical connections), and hold weight without secondary support, are reflected in the below pictures:





65.     BusSTRUT is proud of the benefits of its System and works hard to acquire, and service, national accounts so that retailers and customers across the country will benefit from its proprietary System.

66.     Because of busSTRUT's size, a loss of business can result in a substantial loss of revenue and profits to busSTRUT.

**C.     UEC is Falsely Advertising and Misrepresenting its Competing Starline Product in Violation of Federal and State Laws.**

67.     UEC markets, advertises, and sells a product that competes with busSTRUT's System, Starline Track Busway (including corresponding power drops) ("Starline").

68.     While the marketing, advertising, and sale of this product is a blatant violation of UEC's agreements with busSTRUT—*see, e.g.*, Section D below—it separately violates Federal and State Laws including, but not limited to, the Lanham Act in at least two primary ways.

69.     First, UEC advertises and represents that Starline "is a universal solution and gives [customers] the option of using whichever lighting fixture [customers] prefer"—i.e., Starline fitters can be mated to any lighting fixture.[1]

70.     This statement is demonstrably false; as UEC knows, UL requires that fitters be tested in conjunction with many types of lighting fixtures.

71.     Compliance and usability is not guaranteed, and even if compliance can be obtained, such requires certifications and exorbitant listing fees.

72.     These false advertisements and misrepresentations confuse and deceive customers and constitute unfair competition.

---

[1] *See, e.g.*, https://www.starlinepower.com/applications/lighting/#busway.  Similarly, UEC advertises that " . . . years down the road when you may require new lights, you are not forced to go back to the same company you bought them from" —i.e., Starline's fitter can be mated to any lighting fixture.  *Id*.

73.     They also encourage unsafe practices, as customers are falsely led to believe that they can haphazardly mate Starline fitters with any light fixture without analysis and testing.

74.     Second, UEC advertises and represents Starline as a product incorporating unistrut.

75.     For example, UEC advertises that Starline "incorporates the unistrut in its housing structure."[2]

76.     Starline does not incorporate Unistrut.

77.     Accordingly, this statement is demonstrably false.

78.     Moreover, "strut" is synonymous with steel in the construction industry.

79.     However, Starline has aluminum—not steel—lengths.

80.     In reality, upon information and belief, the only steel portions of Starline are its power drops and feed boxes.

81.     Customers are therefore also misled and/or deceived into thinking that Starline is steel and/or has the same rigidity as steel.

82.     Customers are also misled into falsely associating Starline with the marketing goodwill associated with steel materials.

**D.     BusSTRUT Partners With UEC For Approximately Fourteen Years; Making UEC Millions of Dollars in the Process.**

83.     BusSTRUT and UEC had a long-standing business and contractual relationship.

84.     For approximately fourteen (14) years, busSTRUT partnered with UEC and UEC supplied busSTRUT with its Power Distribution System needs.

85.     BusSTRUT's partnership has been incredibly rewarding to UEC and is responsible for revenues in excess of $27 million dollars; with a substantial portion of those revenues coming in the recent years as a result of busSTRUT's contract and business with Target Corporation.

---

[2] *See, e.g.*, https://www.starlinepower.com/applications/lighting/#busway.

###### i.      The Parties' Non-Competition Agreements

86.     A core and necessary component of the Parties' relationship is that the Parties would not take one another's customers and UEC would not supply/manufacture competing products (i.e., they would not compete with each other).

87.     During the Parties' fourteen (14) year relationship UEC recognized and purported to honor these obligations by refusing to get involved in business opportunities and/or contractual relationships busSTRUT was involved in.

88.     Indeed, UEC acknowledged this as recently as an August 1, 2018 phone call.

89.     At least a portion of the Parties' non-competition agreement was memorialized in busSTRUT and UEC's Exclusive Manufacturing and Distribution Agreement; originally dated May 14, 2004 and extended repeatedly throughout the Parties' relationship until May 14, 2018 (the "Distribution Agreement").

90.     Section 8 of the Distribution Agreement reads as follows:

**Section 8      Non-Competition** – During the term of this agreement, Universal shall not, without prior written consent of Architectural, directly or indirectly engage in the manufacture of or have manufactured for it or purchase or sell Steel Power Distribution System(s) other than the Steel Power Distribution System(s) and components manufactured by Universal for Architectural. Universal shall be permitted to sell the Steel Power Distribution System(s) to customers outside of the markets covered by Architectural, under the same formula as stated in Section 4.

91.     This provision ensured that great efforts undertaken by busSTRUT to acquire and retain customers, such as Target Corporation, would not be undercut by UEC offering substantially similar products.

92.     More generally, it also ensured that UEC would not manufacture, have manufactured, purchase, or sell a substantially similar product—a "Steel Power Distribution System".

93.     As UEC is aware, a key part and component of busSTRUT's System is its ability to "drop power" through power cords (hereinafter, "power drops").

94.     These power drops are "parts and components" that make up busSTRUT's System and thus fall under Section 8.[3]

95.     Likewise, because of Starline's use of steel in connection with its power feed unit— i.e., where the power is distributed from—Starline would also fall under Section 8.[4]

96.     Notably, UEC states "[t]he Busway [Starline] system **_would not work_** without the use of a Power Feed Unit."[5]

97.     Upon information and belief, Starline's power drops incorporate steel.

98.     UEC's sale of power drops and Starline each violate the plain language of Section 8.

99.     Moreover, from the early outset of the relationship, the Parties made clear to each other that they would not interfere with one another's business and/or compete for the same.

100.     For example, in approximately 2009 Mr. Larry Gellert met with Mr. Joel Ross at UEC's headquarters and was told of UEC's sizeable amount of inventory designated for UEC's business with Walmart.

101.     Mr. Ross made clear that busSTRUT could not compete with and/or bid on the Walmart business.

---

[3] "Steel Power Distribution System(s)" is defined as "**_all parts and components_** required to make up a complete busway, track or raceway system".  Distribution Agreement, at Section 3(i) (emphasis added).  "The key design specification is that the housing shall be constructed out of steel."  _Id._ (emphasis added).  Notably, upon information and belief, the power feed boxes and the power drops UEC sells contain steel.

[4] UEC represents that Starline is constructed out of and has the same rigidity as steel which separately violates Section 8.  Indeed, UEC is liable irrespective of the position it takes on Starline.  If UEC contends Starline is constructed out of steel, then UEC violated Section 8.  If UEC contends it is not, then UEC is liable under the Lanham Act for false advertisements, misrepresentations, and false association based on its contrary representations.

[5] https://www.starlinepower.com/busway/products/40-50-60/ (emphasis added).

102.    Notwithstanding Mr. Gellert's longstanding relationship with Walmart going back to the 1990's—wherein Mr. Gellert taught Walmart how to use Power Distribution Systems for "trunking"—Mr. Gellert honored this request based on the understanding that UEC would reciprocate.

103.    Accordingly, and consistent with Section 8 above, busSTRUT and UEC agreed they would not bid on each other's business and/or compete for the same.

104.    The Parties' history is replete with examples of adherence to this agreement and its expansion in scope.

105.    For example, UEC stated it had a process in place to ensure busSTRUT's customers did not receive Power Distribution Systems offered through UEC, and even pledged to give busSTRUT competitive advantages by "carrying finished goods inventory, through product enhancements and addition, and by keeping prices high for other OEMs."

106.    Further, during discussions and negotiations with Target Corporation, Mr. Michael Gellert of busSTRUT called Mr. Lance Sabados of UEC to seek assistance in securing the Target Corporation business.  Mr. Sabados stated that UEC was not aware of any other companies seeking Target Corporation's business, and that he would tell Mr. Gellert if that changed.

107.    Moreover, in approximately 2015 and after substantial growth by busSTRUT, UEC adopted an informal registration process and agreed to refuse to quote third parties seeking to quote/bid on busSTRUT's customers (i.e., compete with busSTRUT).

108.    In addition, and ironically, in the summer of 2017 Mr. Steve Ross visited busSTRUT's headquarters to purportedly show UEC's appreciation for busSTRUT's recent growth (substantially all of which he knew was attributable to Target Corporation's contract with busSTRUT).

109.    Similar to Mr. Joel Ross's mention of UEC's Walmart inventory to Mr. Larry Gellert, Mr. Steve Ross was shown busSTRUT's enormous stock of inventory designated for Target.

110.    This is the same inventory that busSTRUT has now been left holding because of UEC's substantial misconduct.

111.    While the Parties' non-competition agreements have expanded in scope over time, the Parties unquestionably agreed to not compete with one another with respect to their customers and that UEC would not manufacture, have manufactured, purchase, and/or sell a substantially similar product through various agreements (including, but not limited to, the Distribution Agreement), their course of conduct, course of dealings, and course of performance.

112.    UEC's manufacturing and sale of power drops to busSTRUT's customers, such as Target, violates the Parties' agreements.

113.    In addition, UEC's sale of power drops incorporating steel violates the Parties' agreements.

114.    Moreover, UEC's sale and marketing of Starline violates the Parties' agreements.

**ii.     The Parties' Confidentiality Agreements**

115.    The Parties' non-competition and related agreements were incredibly important to busSTRUT because UEC had access to some of busSTRUT's most sensitive and confidential information as a result of their longstanding relationship; all of which UEC agreed to keep confidential and not use except to advance the Parties' business relationship.  This information included busSTRUT's pricing, volumes, forecasts, customer-specific information, marketing techniques, and technology.

116.    Accordingly, similar to the non-compete, the Parties memorialized their agreement

to keep this information confidential:

**Section 11**     **Confidentiality** – The Parties have proprietary interests in certain Confidential Information furnished to each other prior to or pursuant to this Agreement. The Parties agree to keep in confidence and not to disclose, without the prior written consent of the other Party, any Confidential Information, provided it is disclosed in writing and marked as Confidential Information at the time it is disclose.

The provisions of this **Section 11** shall not apply to Confidential Information which: (i) is or becomes generally known or available to the public without breach of this Agreement; (ii) is received from a third person without limitation or restriction at the time of disclosure; or (iii) was known to the recipient, as can be documented by the recipient's written records, prior to receiving the Confidential Information.

The Parties may disclose such Confidential Information where required by any court, government agency or proper discovery request or to the extent necessary to secure governmental authorization. Before making a disclosure, the recipient of Confidential Information shall, to the extent practicable: (i) provide the other Party with timely advance notice of its intent to comply with the disclosure requirement in order to allow the other Party to make objection to the disclosure requirement; (ii) minimize the amount of Confidential Information to be disclosed consistent with the interests of the other Party and the requirements of the court, government agency or discovery request involved; and (iii) make reasonable efforts to secure confidential treatment of the Confidential Information to be provided or to seek revision of the information request to minimize the amount of Confidential Information to be supplied.

Upon the request of either Party, and in any event upon the termination of this Agreement, each Party shall either return all of the requesting Party's Confidential Information, including all originals, copies and records pertaining to the Confidential Information, or furnish to the requesting Party an officer's certificate of destruction of the requesting Party's Confidential Information.

117.    This provision, as well as the Parties' related agreements, required UEC to hold

busSTRUT's confidential information in confidence and to not use the same except in connection

with furthering the performance of the Parties' agreement.

### iii.    UEC's Repeated and Well Documented Failures to Timely Ship Supplies

118.    One of the purposes of the UEC relationship was to ensure busSTRUT was not

forced to stock, warehouse, and drop ship inventory; UEC would handle that burden.

119.     For the first twelve years of the Parties' relationship, UEC adequately performed and busSTRUT was not forced to bear that burden.

120.     However, as busSTRUT grew, UEC routinely and inexcusably failed to timely deliver busSTRUT product in breach of its obligations and representations to busSTRUT.

121.     Time and time again, UEC ignored busSTRUT's forecasts and failed to timely deliver product.

122.     These egregious delays represented an existential threat to busSTRUT's business and put at risk countless busSTRUT customer relationships as well as busSTRUT's reputation in the marketplace.

123.     As a result, because busSTRUT could not depend on UEC to timely ship product, busSTRUT was forced to bear a burden it never agreed to by effectively becoming its own supplier—stocking, warehousing, and drop shipping inventory at its own expense.

124.     Likewise, busSTRUT was forced to hold substantially more inventory than the Parties ever intended to ensure it could satisfy its customer's demands.

**E.** **After an Arduous and Expensive Courting Process, BusSTRUT Secures a Long Term and Lucrative Agreement With Target**

125.     In early 2015, Target came to busSTRUT with the problem of efficiently hanging general and accent light fixtures below their stores' ceiling, in electrical grid configurations, while also mechanically supporting décor boards, heavy general light fixtures, and dropping power.

126.     These types of problems are common among large retailers and supermarkets and is one of the primary reasons busSTRUT's System is so attractive to those customers.

127.     The need to drop power was especially important to a specific type of Target store; referred to as "Super Targets".

128.    Generally speaking, as compared with a typical Target store, Super Targets require that power be dropped from an overhead Power Distribution System to the floor.

129.    BusSTRUT dedicated substantial hours and resources to creating a customized solution to solving Target's issues and satisfying Target's requests.

130.    To that end, busSTRUT's design template and System was piloted at a Super Target in Minnetonka, Minnesota to great acclaim.

131.    A second pilot was then done at Target's headquarters.

132.    Thereafter, busSTRUT was included in a "LA25" P-Fresh program (25 Target P-Fresh stores in the greater Los Angeles, California area) which was dubbed by Target as a feasibility test for a nationwide, exclusive rollout of the System.

133.    In approximately September 2016, Target invited busSTRUT to bid on two Requests for Proposals ("RFP") for two-year terms (2017-2018).

134.    Those two RFPs were a "Light Duty" RFP and a "Heavy Duty" RFP.

135.    Because busSTRUT's System was best suited for the Heavy Duty RFP, properly characterized as heavy duty track, and would not be competitive from a cost standpoint with respect to light duty track, busSTRUT declined to bid on the Light Duty RFP.

136.    BusSTRUT did, however, bid on the Heavy Duty RFP.

137.    Target invited busSTRUT to its corporate headquarters in Minneapolis for a day-long, in person meeting to engage in further negotiations regarding the Heavy Duty RFP.

138.    Notably, during negotiations and the bidding process, busSTRUT communicated with UEC regarding the RFP and the potential Target business.

139.    More specifically, consistent with the Parties' agreements and prior course of performance, UEC promised to refrain from providing quotes for the Target business and to let busSTRUT know if anyone requested the same.

140.    After negotiations, Target agreed to use busSTRUT for all of its Power Distribution System needs for an extended 3-year term (instead of the RFP's 2-year term) until the end of 2019 in exchange for a lower pricing commitment by busSTRUT and busSTRUT's obligation to fulfill Target's Power Distribution System needs during the term.

141.    The parties ultimately entered into an agreement memorializing this arrangement and had substantial conversations and correspondence around the same (hereinafter the "Target Agreement").

142.    The Target Agreement obligated Target to use busSTRUT, and busSTRUT to supply Target, with all of Target's Power Distribution System needs for an approximate three (3) year term starting on November 11, 2016 and ending on December 31, 2019.

143.    Under the Target Agreement, Target was obligated to fulfill any need for Power Distribution Systems (also referred to as "Heavy Duty" and "Structural" track) through busSTRUT; usually in the form of new or remodeled stores.  The risk of volume—i.e., the actual amount of new and remodeled stores, and Target's corresponding requirements—was on busSTRUT.  However, under the agreement, there was no risk of substitution because busSTRUT would be Target's exclusive supplier for Power Distribution System requirements for the term.

144.    For over a year, busSTRUT seamlessly satisfied Target's Power Distribution System needs for hundreds of new stores and remodels across the country.  This resulted in millions of dollars of revenues to busSTRUT (as well as UEC).

145.   During the term of the Target Agreement, Target regularly issued "plans" and "schedules" for their upcoming new stores and remodels to busSTRUT.  This was often done with reference to particular "Flights" and in the form of excel spreadsheets with hundreds of line items reflecting information about each individual store to which busSTRUT was to supply Power Distribution Systems.  BusSTRUT used these plans and schedules to purchase sufficient material and hire staff to ensure busSTRUT could meet Target's needs.

146.   BusSTRUT also used these plans and schedule to provide forecasts to UEC and otherwise convey confidential information (sometimes at UEC's request) and based upon the understanding that such information would be kept confidential and only used to further busSTRUT's business and the Parties' agreements.

**F.   UEC Assists BusSTRUT in Performing Under the Target Agreement**

147.   UEC was unquestionably aware of busSTRUT's agreement and business relationship with Target because busSTRUT regularly discussed the same with UEC, UEC supplied busSTRUT for Target's business, and UEC regularly requested, and received, forecasts from busSTRUT as to Target's forthcoming needs.

148.   UEC made millions of dollars as a result of busSTRUT's agreement with Target and purchases connected with the same.

149.   UEC frequently referred to Target as busSTRUT's "customer".

150.   UEC was aware that busSTRUT's agreement with Target was a multi-year agreement.

151.   Indeed, in multiple phone calls just in the past month, UEC admitted that it knew that busSTRUT had a multi-year agreement with Target Corporation.

152.    Given the substantial "ramp up" in Target stores anticipated in the latter half of 2018 and 2019,[6] the future looked bright for busSTRUT.   To that end, busSTRUT began purchasing material, and hiring additional employees in anticipation of the substantial business with Target.  BusSTRUT expected 2018 and 2019 to be its most profitable years ever; largely—if not completely—as a result of Target's business.

153.    Unbeknownst to busSTRUT, however, UEC would ultimately stab busSTRUT in the back and misappropriate the Target business in violation of the Parties' agreements and basic legal principles.

**G.    UEC Betrays BusSTRUT By Misappropriating the Target Business and Falsely Advertising a Competing Product**

154.    It is axiomatic that the Parties' agreements and longstanding relationship required, as did basic legal principles and duties, UEC—including through any third parties or intermediaries—to refrain from interfering with the Target Agreement and busSTRUT's business relationship with Target.

155.    In a blatant violation of the Parties' longstanding business relationship and agreements, as well as basic legal principles, UEC tortuously interfered with the Target Agreement and busSTRUT's business relationship with Target Corporation.

156.    Indeed, in multiple phone calls just in the past month, UEC has admitted to the following:

    a)    Doing business with Target by supplying "Super Target" stores with power drops.

    b)    UEC knew that busSTRUT had a multi-year agreement with Target Corporation when it stole the Target business.

---

[6] *See, e.g.,*  https://corporate.target.com/press/releases/2018/03/target-announces-plans-to-accelerate-multiyear-str ("This year, Target will nearly triple the size of its remodel program, updating more than 300 stores around the country.").

     c)     In complete contravention of the Parties' long-standing relationship, agreements, and contract, UEC did not even bother to contact busSTRUT before quoting and stealing the business (presumably to hide UEC's nefarious conduct).

157.    Further, upon information and belief, UEC was actively and simultaneously interfering with the Target Agreement and busSTRUT's business relationship while negotiating a renewal of busSTRUT and UEC's contractual arrangement, otherwise set to expire May 14, 2018.

158.    More specifically, the following timeline occurred.

     a)     On March 23, 2018, UEC offered busSTRUT a renewed contract allowing for termination upon 90 days notice. On April 27th, this offer was rescinded and replaced with a far more onerous contract offer.

     b)     On May 1st, a Target engineer reached out to busSTRUT with questions clearly aimed at comparing busSTRUT's power drop design to another's.

     c)     On May 24th, Mr. Lance Sabados on behalf of UEC states he cannot be reached until June 5th, and that he will get back to busSTRUT on a contract renewal then.

     d)     BusSTRUT never heard back from Mr. Sabados on or after June 5th regarding a contract renewal.

159.    Notably, unlike other Target business, the "Super Target" business required power drops which were supplied by busSTRUT.

160.    The Super Target business alone was responsible for millions of dollars a year in revenues to busSTRUT and as a result of UEC's misconduct busSTRUT has sustained, and will continue to sustain, millions of dollars in damages.

161.    As a result of UEC's tortious interference, and breaches of the Parties' agreements, Target breached its contract with busSTRUT and "substituted" busSTRUT as its exclusive supplier of Power Distribution Systems (including power drops).

162.    But for UEC's tortious conduct, at a minimum, busSTRUT would continue to supply Target for its Super Target stores.

163.    Upon information and belief, UEC also separately interfered with busSTRUT's relationship and potential opportunities with other customers including, but not limited to, as described above in connection with UEC's false advertising and misrepresentations as to Starline.

164.    Moreover, the Parties' agreements and longstanding relationship required, as did basic legal principles and duties, UEC to keep busSTRUT's information confidential and only to use the same in conjunction with furthering the parties' business relationship.  This includes, but is not limited to, busSTRUT's pricing, busSTRUT's costs, timing, vendors, and volume of purchases.

165.    Upon information and belief, UEC misappropriated busSTRUT's confidential information in seeking to misappropriate, and actually misappropriating, the Target business.

166.    Further, upon information and belief, UEC incentivized employees to act inappropriately and tortuously interfere with contracts and business relationships.

167.    Upon information and belief, UEC also misappropriated busSTRUT's confidential information in marketing its Starline product.  One example is UEC's focus on lighting with an emphasis on Starline lighting "fit[ting] any grid configuration" and "built with Unistrut in its housing structure."  It even appears that the emphasis on "strut" is only used on UEC's website as associated with lighting—mimicking busSTRUT's strategy that resulted in a substantial increase in volume of purchases that UEC was privy to as a result of the Parties' confidential relationship.

168.    There is undoubtedly further wrongful conduct and details of which busSTRUT has not yet discovered due to UEC's failure to be forthright and transparent regarding the same.  These additional details will be subject to further discovery.

169.    Because of UEC's misconduct, busSTRUT has substantial damages well in excess of five million dollars.  Moreover, busSTRUT likely would have continued business with Target— at least with respect to Super Target stores—through at least 2020.

## COUNT ONE

### For Violations of the Lanham Act, 15 U.S.C. § 1125(a)(1), Against UEC
### (False Advertising and Misrepresentations)

170.    BusSTRUT hereby incorporates by reference the preceding paragraphs of the Complaint as if the same were set forth fully herein.

171.    In acting as alleged above, UEC violated—and continues to violate—section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)(1)), in connection with Starline by using in commerce words, terms, names, or symbols, or a combination thereof, which in commercial advertising misrepresents and falsely advertises the nature, characteristics, and/or qualities of its goods, services, and/or commercial activities in connection with Starline.

172.    In acting as alleged above, UEC also violated section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)(1)) in connection with Starline by using in commerce false or misleading descriptions of fact, or false or misleading representations of fact, which in commercial advertising or promotion, misrepresented the nature, characteristics, or qualities of its goods, services, and/or commercial activities in connection with Starline.

173.    UEC's misrepresentations, actions, and false advertising in violation of 15 U.S.C. § 1125(a)(1) proximately caused, and will continue to cause, an injury to a commercial interest in sales or business reputation of busSTRUT.

174.    UEC has wrongfully profited from such false advertisements and misrepresentations.

175.    UEC had direct and full knowledge of busSTRUT's rights and the misrepresentations complained of herein.  The knowing, intentional, and willful nature of the acts set forth herein renders this an exceptional case under 15 U.S.C. § 1117(a).

176.    Accordingly, pursuant to 15 U.S.C. § 1117(a), busSTRUT is entitled to recover: (1) UEC's profits, or an amount that is adequate, which the Court finds to be just according to the circumstances of the case, as compensation; (2) the damages sustained by busSTRUT, in a sum above the amount found as actual damages, not exceeding three times such amount; (3) the costs of the action; and (4) reasonable attorney fees should the Court find this to be an exceptional action.

WHEREFORE, Plaintiff busSTRUT respectfully requests that this Court enter Judgment in its favor on Count One and against Defendant UEC and grant busSTRUT the relief set forth in its Prayer for Relief.

## COUNT TWO

### For Violations of the Lanham Act, 15 U.S.C. § 1125(a)(1), Against UEC
### (False Association)

177.    BusSTRUT hereby incorporates by reference the preceding paragraphs of the Complaint as if the same were set forth fully herein.

178.    In acting as alleged above, UEC violated—and continues to violate—section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)(1)), in connection with Starline by using in commerce words, terms, names, or symbols, or a combination thereof, which were likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of its goods, services, and/or commercial activities in connection with Starline, or as to the origin, sponsorship, or approval of its goods, services, and/or commercial activities in connection with Starline.

179.    In acting as alleged above, UEC also violated section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)(1)), in connection with Starline by using in commerce false or misleading

descriptions of fact, or false or misleading representations of fact, which in commercial advertising or promotion, misrepresented the nature, characteristics, or qualities of its goods, services, and/or commercial activities in connection with Starline.

180.     UEC's misrepresentations, actions, and false advertising in violation of 15 U.S.C. § 1125(a)(1) proximately caused, and will continue to cause, an injury to a commercial interest in sales or business reputation of busSTRUT.

181.     UEC has wrongfully profited from this misconduct and the false association.

182.     UEC had direct and full knowledge of busSTRUT's rights and the misrepresentations complained of herein.  The knowing, intentional, and willful nature of the acts set forth herein renders this an exceptional case under 15 U.S.C. § 1117(a).

183.     Accordingly, pursuant to 15 U.S.C. § 1117(a), busSTRUT is entitled to recover: (1) UEC's profits, or an amount that is adequate, which the Court finds to be just according to the circumstances of the case, as compensation; (2) the damages sustained by busSTRUT, in a sum above the amount found as actual damages, not exceeding three times such amount; (3) the costs of the action; and (4) reasonable attorney fees should the Court find this to be an exceptional action.

WHEREFORE, Plaintiff busSTRUT respectfully requests that this Court enter Judgment in its favor on Count Two and against Defendant UEC and grant busSTRUT the relief set forth in its Prayer for Relief.

## COUNT THREE

### For Breach of Contract Against UEC: Section 8 of the Distribution Agreement

184.     BusSTRUT hereby incorporates by reference the preceding paragraphs of the Complaint as if the same were set forth fully herein.

185.     As alleged herein, UEC and busSTRUT had enforceable agreements.

186.     One such agreement was Section 8 of the Distribution Agreement.

187.    The Distribution Agreement was a valid, binding, and enforceable contract between UEC and busSTRUT.

188.    As explained above, Section 8 of the Distribution Agreement required UEC to refrain from competing with busSTRUT with respect to Steel Power Distribution Systems.

189.    As explained above, UEC has repeatedly breached Section 8 including, but not limited to, by sale and marketing of the Starline product, sale of power drops, and doing business with Target.

190.    UEC's breaches of Section 8 have proximately caused busSTRUT to suffer damages and UEC has wrongfully profited from its breaches.

191.    BusSTRUT has been, and continues to be, damaged as a result of UEC's breaches as alleged above.

192.    BusSTRUT is entitled to recover damages against UEC.

193.    Because of UEC's prior and material breaches of the agreements, busSTRUT was relieved—and continues to be relieved of—further performance under the agreements including the Distribution Agreement.

WHEREFORE, Plaintiff busSTRUT respectfully requests that this Court enter Judgment in its favor on Count Three and against Defendant UEC and grant busSTRUT the relief set forth in its Prayer for Relief.

## COUNT FOUR

**For Breach of Contract Against UEC: The Parties' Non-Competition Agreements**

194.    BusSTRUT hereby incorporates by reference the preceding paragraphs of the Complaint as if the same were set forth fully herein.

195.    As alleged herein, UEC and busSTRUT had enforceable agreements.

196.    One such agreement was the Parties' agreement to not compete for each other's customers (including indirectly by quoting others for that business) and by UEC not manufacturing, having manufactured, purchasing, and/or selling products substantially similar to busSTRUT's System.

197.    This agreement was a valid, binding, and enforceable contract between UEC and busSTRUT.

198.    As explained above, UEC has repeatedly breached this agreement including, but not limited to, by sale of the Starline product, sale of the power drops, and doing business with Target.

199.    UEC's breaches have proximately caused busSTRUT to suffer damages and UEC has wrongfully profited from its breaches.

200.    BusSTRUT has been, and continues to be, damaged as a result of UEC's breaches as alleged above.

201.    BusSTRUT is entitled to recover damages against UEC.

202.    Because of UEC's prior and material breaches of the agreements, busSTRUT was relieved—and continues to be relieved of—further performance under the agreements

WHEREFORE, Plaintiff busSTRUT respectfully requests that this Court enter Judgment in its favor on Count Four and against Defendant UEC and grant busSTRUT the relief set forth in its Prayer for Relief.

## **COUNT FIVE**

**For Breach of Contract Against UEC: Section 11 of the Distribution Agreement**

203.    BusSTRUT hereby incorporates by reference the preceding paragraphs of the Complaint as if the same were set forth fully herein.

204.    As alleged herein, UEC and busSTRUT had enforceable agreements.

205.    One such agreement was Section 11 of the Distribution Agreement.

206.    The Distribution Agreement was a valid, binding, and enforceable contract between UEC and busSTRUT.

207.    As explained above, Section 11 of the Distribution Agreement required UEC to keep confidential and not disclose busSTRUT's confidential information, and only use the same in connection with performing under the Parties' agreements.

208.    Upon information and belief, UEC has breached Section 11 by misappropriating busSTRUT's confidential information in connection with its marketing and sale of the Starline product as well as power drops.   In addition, upon information and belief, UEC has breached Section 11 in connection with seeking, and obtaining, the Target business.

209.    UEC's breaches of Section 11 have proximately caused busSTRUT to suffer damages and UEC has wrongfully profited from its breaches.

210.    BusSTRUT has been, and continues to be, damaged as a result of UEC's breaches as alleged above.

211.    BusSTRUT is entitled to recover damages against UEC.

212.    Because of UEC's prior and material breaches of the agreements, busSTRUT was relieved—and continues to be relieved of—further performance under the agreements including the Distribution Agreement.

WHEREFORE, Plaintiff busSTRUT respectfully requests that this Court enter Judgment in its favor on Count Five and against Defendant UEC and grant busSTRUT the relief set forth in its Prayer for Relief.

## COUNT SIX

**For Breach of Contract Against UEC: The Parties' Confidentiality Agreements**

213.    BusSTRUT hereby incorporates by reference the preceding paragraphs of the Complaint as if the same were set forth fully herein.

214.    As alleged herein, UEC and busSTRUT had enforceable agreements.

215.    One such agreement was UEC's agreement to keep busSTRUT's information confidential and not disclose the same, and only use it in connection with performing under the Parties' agreements.

216.    This agreement was a valid, binding, and enforceable contract between UEC and busSTRUT.

217.    Upon information and belief, UEC breached this agreement by misappropriating busSTRUT's confidential information in connection with its marketing and sale of the Starline product as well as power drops.  In addition, upon information and belief, UEC has breached this agreement in connection with seeking, and obtaining, the Target business.

218.    UEC's breaches have proximately caused busSTRUT to suffer damages and UEC has wrongfully profited from its breaches.

219.    BusSTRUT has been, and continues to be, damaged as a result of UEC's breaches as alleged above.

220.    BusSTRUT is entitled to recover damages against UEC.

221.    Because of UEC's prior and material breaches of the agreements, busSTRUT was relieved—and continues to be relieved of—further performance under the agreements including the Distribution Agreement.

WHEREFORE, Plaintiff busSTRUT respectfully requests that this Court enter Judgment in its favor on Count Six and against Defendant UEC and grant busSTRUT the relief set forth in its Prayer for Relief.

## COUNT SEVEN

### Tortious Interference With Contract Against UEC

222.    BusSTRUT hereby incorporates by reference the preceding paragraphs of the Complaint as if the same were set forth fully herein.

223.    As alleged herein, there was, and is, a valid contract between busSTRUT and Target.

224.    As alleged herein, UEC knew of that contract.

225.    UEC acted intentionally, unjustifiably, and/or wrongfully to induce Target to breach that contract with busSTRUT.

226.    UEC intended to harm to harm busSTRUT and busSTRUT's relationship with Target in so acting.

227.    UEC was not privileged nor justified in so acting; the interference was and is improper.

228.    As a result, and as alleged herein, Target breached its contract with busSTRUT.

229.    As alleged herein, busSTRUT was harmed as a result.

230.    As alleged herein, UEC's conduct was a substantial factor in causing busSTRUT harm.

231.    BusSTRUT is entitled to recover damages against UEC as a result.

WHEREFORE, Plaintiff busSTRUT respectfully requests that this Court enter Judgment in its favor on Count Seven and against Defendant UEC and grant busSTRUT the relief set forth in its Prayer for Relief.

## COUNT EIGHT

**Tortious Interference With Prospective Contractual Relations Against UEC**

232.   BusSTRUT hereby incorporates by reference the preceding paragraphs of the Complaint as if the same were set forth fully herein.

233.   As alleged herein, there was and is a valid contract between busSTRUT and Target.

234.   There was a promising and lucrative business relationship between Target and busSTRUT in which busSTRUT provided its System for hundreds of stores.

235.   Accordingly, there was a reasonable likelihood or probability of further contractual relations between Target and busSTRUT.

236.   As alleged herein, UEC knew of this contract, business relationship, and the reasonable likelihood or probability of further contractual relations.

237.   As alleged herein, UEC acted with the intention of inducing a breach of the contract and business relationship, inducing a breach of prospective contractual relations, disrupting the performance of this contract, disrupting busSTRUT and Target's contractual relationship, and/or knew that disruption of performance and/or the contractual relationship was certain or substantially certain to occur.

238.   As alleged herein, busSTRUT was harmed as a result.

239.   UEC's conduct was a substantial factor in causing busSTRUT harm as alleged herein.

240.   UEC intended to harm to harm busSTRUT and busSTRUT's relationship with Target in so acting.

241.   UEC was not privileged nor justified in so acting; the interference was and is improper.

242.   BusSTRUT is entitled to recover damages against UEC as a result.

WHEREFORE, Plaintiff busSTRUT respectfully requests that this Court enter Judgment in its favor on Count Eight and against Defendant UEC and grant busSTRUT the relief set forth in its Prayer for Relief.

## COUNT NINE

**For Tortious Interference With Existing and Prospective Economic Relations Against UEC**

243.   As alleged herein, there was an existing and prospective economic relationship between busSTRUT and Target.

244.   This relationship was a promising and lucrative business relationship.  BusSTRUT had successfully implemented its System in hundreds of Target stores.

245.   Accordingly, there was a reasonable likelihood or probability of the current economic relationship would continue and prospective economic relationships would occur.

246.   As alleged herein, UEC knew of this business relationship and the reasonable likelihood or probability that it would continue and result in further business to busSTRUT.

247.   As alleged herein, UEC acted with the intention of harming busSTRUT's existing relationship and to prevent a prospective relationship from occurring.

248.   As alleged herein, busSTRUT was harmed as a result.

249.   UEC's conduct was a substantial factor in causing busSTRUT harm as alleged herein.

250.   UEC intended to harm to harm busSTRUT and busSTRUT's relationship with Target in so acting.

251.   UEC was not privileged nor justified in so acting; the interference was and is improper.

252.   BusSTRUT is entitled to recover damages against UEC as a result.

WHEREFORE, Plaintiff busSTRUT respectfully requests that this Court enter Judgment in its favor on Count Nine and against Defendant UEC and grant busSTRUT the relief set forth in its Prayer for Relief.

## COUNT TEN

### Common Law Unfair Competition Against UEC

253.   BusSTRUT hereby incorporates by reference the preceding paragraphs of the Complaint as if the same were set forth fully herein.

254.   UEC's conduct, as alleged herein, has been, and continues to be common law unfair competition.

255.   This conduct includes, but is not limited to, false advertisements and misrepresentations of Starline, improperly competing with busSTRUT, taking advantage of busSTRUT, and unlawful use of busSTRUT's confidential information.

256.   BusSTRUT has been personally aggrieved by UEC's unfair competition and unlawful business acts and practices as alleged herein, including but not necessarily limited to, by the loss of money, sales, and continuing business.

257.   UEC's unfair competition proximately caused busSTRUT to incur these damages.

258.   BusSTRUT is entitled to recover damages against UEC as a result.

WHEREFORE, Plaintiff busSTRUT respectfully requests that this Court enter Judgment in its favor on Count Ten and against Defendant UEC and grant busSTRUT the relief set forth in its Prayer for Relief.

## COUNT ELEVEN

### For Unjust Enrichment and Restitution Against UEC

259.   BusSTRUT hereby incorporates by reference the preceding paragraphs of the Complaint as if the same were set forth fully herein.

260.    In acting as alleged above, UEC have been unjustly enriched in that UEC have knowingly benefitted at the expense of busSTRUT in a manner such that allowance of UEC to retain the benefits that they received would be unjust.

261.    UEC appreciates the benefits received from busSTRUT.

262.    UEC has accepted and retained these benefit under circumstances that make it inequitable for UEC to retain those benefits without payment of value.

263.    UEC is required to pay busSTRUT value for the benefits retained.

WHEREFORE, Plaintiff busSTRUT respectfully requests that this Court enter Judgment in its favor on Count Eleven and against Defendant UEC and grant busSTRUT the relief set forth in its Prayer for Relief.

## COUNT TWELVE

### Promissory Estoppel

264.    BusSTRUT hereby incorporates by reference the preceding paragraphs of the Complaint as if the same were set forth fully herein.

265.    As explained above, UEC made numerous promises to busSTRUT including, but not limited to, promising not to compete with busSTRUT and not use busSTRUT's confidential information other than for purposes of furthering the Parties' agreements.

266.    BusSTRUT reasonably relied upon these promises in a myriad of ways to their detriment.  This includes, but is not limited to, purchasing inventory for the Target business.

267.    An injustice can be avoided by enforcing UEC's promises.

268.    BusSTRUT has been damaged by UEC's failure to keep its promises and is entitled to recover its damages from the same.

WHEREFORE, Plaintiff busSTRUT respectfully requests that this Court enter Judgment in its favor on Count Twelve and against Defendant UEC and grant busSTRUT the relief set forth in its Prayer for Relief.

## PUNITIVE/EXEMPLARY DAMAGES

269.    UEC's conduct was the result of malice, oppression, and/or fraud.  UEC acted with intent to cause injury, and their conduct was despicable and subjected busSTRUT to cruel and unjust hardship in knowing disregard of busSTRUT's rights.  UEC's conduct was intentional. Accordingly, busSTRUT is entitled to punitive/exemplary damages under applicable law, and specifically pleads and requests the same for any cause of action where such is recoverable.

## CONDITIONS PRECEDENT

270.    All conditions precedent to the contract or claims alleged in this case have been performed, excused, waived or otherwise satisfied as required by applicable law including, but not limited to, the presentment of attorneys' fees claim.

## ATTORNEYS' FEES, COSTS, AND EXPENSES INCURRED

271.    BusSTRUT incorporates the preceding paragraphs as if fully set forth herein.

272.    BusSTRUT is entitled to recover the full amount of its reasonable attorneys' fees costs, and expenses incurred in pursuing its claims in this action.

273.    BusSTRUT requests an award of reasonable attorneys' fees, expenses, and costs incurred with respect to any cause of action where such is recoverable.

## JURY TRIAL DEMAND

274.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiff busSTRUT hereby specifically demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff busSTRUT prays for judgment against Defendant UEC as follows:

(1)     For general damages in amounts exceeding five million dollars;

(2)     For special damages according to proof in amounts exceeding five million dollars;

(3)     For up to three times busSTRUT's actual damages in amounts exceeding five million dollars for all causes of action where such is recoverable;

(4)     For disgorgement and restitution of UEC's income earned from the unfair competition, false advertising, and the other misconduct alleged herein in amounts believed to exceed ten million dollars for all causes of action where such is recoverable;

(5)     With respect to the Lanham Act claims, for three times busSTRUT actual damages in addition to other recoverable amounts pursuant to 15 U.S.C. 1117(a);

(6)     With respect to the Lanham Act claims, for UEC's sales from and related to Starline and damages from the misconduct alleged herein in amounts believed to exceed ten million dollars;

(7)     For punitive damages for all causes of action where such is recoverable;

(8)     For pre-judgment interest on all such damages at the legal rate;

(9)     For costs of suit incurred herein, including reasonable attorneys' fees, for all causes of action where such is recoverable; and

(10)    For such other and further relief as the Court deems just and proper.

Dated:  September 5, 2018                    Respectfully submitted,

                                             /s/ Jonathan D. Marcus
                                             Jonathan D. Marcus (PA ID No. 312829)
                                             jmarcus@marcus-shapira.com
                                             Daniel J. Stuart (PA ID No. 321011)
                                             stuart@marcus-shapira.com
                                             MARCUS & SHAPIRA LLP
                                             301 Grant Street
                                             Pittsburgh, PA 15219
                                             Telephone: (412) 471-3490
                                             Facsimile: (412) 391-8758

Jeremy A. Fielding (*pro hac vice forthcoming*)
Texas State Bar No. 24040895
jfielding@lynnllp.com
Andrew S. Hansbrough (*pro hac vice forthcoming*)
Texas State Bar No. 24094700
ahansbrough@lynnllp.com
**Lynn Pinker Cox & Hurst, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone:     214.981.3800
Facsimile:     214.981.3839

**ATTORNEYS FOR PLAINTIFF
ARCHITECTURAL BUSSTRUT d/b/a
BUSSTRUT**